**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CATHERINE ANDERSON , ) | CASE NO. 1:16-cv-1707 |
| ) | |
| Plaintiff, ) | JUDGE JOHN R. ADAMS |
| ) | |
| v. ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| ) | |
| NANCY A. BERRYHILL, ) | |
| *Acting Comm'r of Social Security*, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff, Catherine Anderson (hereinafter "Plaintiff"), challenges the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter "Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").   This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).   This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.   For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

## I. Procedural History

On October 31, 2013, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of August 5, 2013. (Transcript ("Tr.") 13, 200-232). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an ALJ. (Tr. 72-113). Plaintiff participated at a hearing on December 4, 2014, was represented by counsel, and testified. (Tr. 13-59). A vocational expert ("VE") also participated and testified. (*Id*.) On December 22, 2014, the ALJ found Plaintiff not disabled. (Tr. 23.) On May 13, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 4-7). On July 5, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11, 13 & 14).

Plaintiff asserts the following assignments of error: (1) the ALJ improperly disregarded the opinions of her treating sources; and (2) the finding at Step Five was contrary to law and/or not supported by substantial evidence. (R. 11).

## II. Evidence

**A. Personal and Vocational Evidence**

Plaintiff was born in January of 1960 and was 52-years-old on the alleged disability onset date. (Tr. 200.) She had a high school education and was able to communicate in English. (Tr. 21). She had past relevant work as a personal attendant, hardware salesperson, accounting clerk, and a buyer. (*Id*.)

**B. Relevant Medical Evidence**[1]

   **1. Treatment Records**

On October 21, 2013, Plaintiff was seen by psychiatrist Elise Bonder, M.D. (Tr. 619-620, Exh. 9F at pp. 57-58).   Dr. Bonder's mental status examination revealed fair grooming and hygiene, a "sad" mood, a dysthymic affect, a tangential and circumstantial thought process, fair insight and judgment. (Tr. 619).   Plaintiff was alert and oriented x 3 with fair concentration. *Id*.   Plaintiff had no hallucinations and did not report any suicidal/homicidal ideation. *Id*.   Dr. Bonder diagnosed major depressive disorder—severe and recurrent, anxiety disorder NOS, alcohol dependence, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55, indicating moderate symptoms.[2]

On November 4, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 607-609, Exh. 9F at pp. 45-47). Plaintiff reported moderate to severe depression, which had been improving over the last two weeks since starting Remeron. (Tr. 607).   Associated symptoms had also improved. *Id*.   Plaintiff started regaining interest in activities, and she had no recent panic attacks. *Id*.   On mental status examination, Dr. Bonder noted Plaintiff had fair grooming, a "better" mood, her affect was brighter, mood-congruent with a "more full range," her thought process was tangential and circumstantial, her insight and judgment were fair, and she was alert and oriented x 3 with fair

---

[1]  The recitation of the evidence is not intended to be exhaustive.   Because Plaintiff's assignments of error revolve around the weight ascribed to the opinions of her mental health providers, this report and recommendation focuses primarily on those portions of the record that the ALJ identified as inconsistent with their opinions, and a few others deemed relevant by the Court.

[2]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.   A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

concentration. (Tr. 607-608). Plaintiff had no hallucinations and did not report any suicidal/homicidal ideation. (Tr. 608).

On November 5, 2013, Plaintiff was seen by Mary Brahm, a licensed social worker ("LSW"). (Tr. 605-606, Exh. 9F at pp. 43-44). Plaintiff reported an improved mood since starting medication two weeks earlier. (Tr. 605). She noted having seven animals and good social support from close friends. *Id*. Plaintiff's diagnoses included major depressive disorder—severe and recurrent, anxiety disorder NOS, alcohol dependence in early remission, and was assigned a GAF score of 55. *Id*.

On November 25, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 599-600, Exh. 9F at pp. 37-38). Plaintiff reported moderate to severe depression that continued to improve over the last four weeks since starting Remeron. (Tr. 599). Her interest continued to improve in walking her dogs, hunting for fossils, and meditation. *Id.* Motivation and concentration remained poor, but she was no longer having passive suicidal ideation. *Id*. Her severe global anxiety worsened since finishing her prescription for Ativan; she particularly worried about finances and being unemployed. *Id*.

On November 27, 2013, during a medication pick-up, Plaintiff told the nurse she was reading a book on depression and has a "little better understanding on her disorder." (Tr. 597). The nurse cautioned Plaintiff to "not take on s/s [signs and symptoms] just because she read them in a book." (Tr. 597).

On December 16, 2013, Plaintiff was seen by Dr. Bonder. (Tr. 591-592, Exh. 9F at pp. 29-30). On mental status examination, Plaintiff's mood was "better." (Tr. 591). She was calm and cooperative, her affect was dysthymic, her thought process was tangential and circumstantial, and her insight, judgment, and concentration were all fair. (Tr. 591). She was alert and oriented

4

x 3, and had no hallucinations or suicidal/homicidal ideation. *Id*.

On December 30, 2013, Plaintiff was seen Dr. Bonder. (Tr. 586-587, Exh. 9F at pp. 24-25). On mental status examination, her mood was "not good," and her thought process was less tangential and circumstantial. (Tr. 586). Otherwise, she was largely unchanged. *Id*.

On January 27, 2014, Plaintiff was seen by Dr. Bonder. (Tr. 578-579, Exh. 9F at pp. 16-17). Plaintiff had fair grooming and hygiene, a "better" mood but "down," a dysthymic affect, less tangential and circumstantial thought process, no hallucinations, no suicidal/homicidal ideation, fair insight and judgment, and she was alert and oriented x 3 with fair concentration. (Tr. 578).

On February 4, 2014, Plaintiff was seen by Dr. Bonder. (Tr. 570-571, Exh. 9F at pp. 8-9). Her mental status examination yielded the same results as the visit one week earlier. *Id*.

On March 7, 2014, medical records completed by a nurse note that Plaintiff picked up her medications, and that she was "pleasant and cooperative," her mood was "a little down, but [she was] willing to attempt to be active and positive." (Tr. 566, Exh. 9F at p. 4).

On May 5, 2014, Plaintiff was seen by Dr. Bonder, who noted Plaintiff had a "low" mood, a dysthymic affect, and poor concentration. (Tr. 639-640, Exh. 11F at pp. 6-7).

On June 2, 2014, Plaintiff reported to Dr. Bonder that she had moderate to severe depression that worsened after she intentionally discontinued Wellbutrin two weeks earlier due to side effects. (Tr. 642, 649 Exh. 11F at p. 9, 16). She reported low energy and motivation, but still read books though she had trouble concentrating on them. *Id*. She had good support from friends, who help her financially. *Id*. She denied any alcohol use since October of 2013, when she briefly relapsed after fourteen years of sobriety. *Id*.

On July 29, 2014, Plaintiff was seen Dr. Bonder. (Tr. 653-654, Exh. 11F at p. 20). Plaintiff's social history included living alone with three dogs and three cats. (Tr. 653). Dr. Bonder's

5

assessment included "a history of depression seen for a follow-up apt, her first with this provider. Partial response to Zoloft with regards to depression, much relief from anxiety from seroquel. Will uptitrate Zoloft to targe[t] depressive symptoms. Will consider suitability for resident therapy clinic, as patient has no therapy provider." *Id*.

On October 16, 2014, Plaintiff was seen by Kerning Gao, M.D. at the psychiatry department of University Hospitals. (Tr. 661-662, Exh. 12F at pp. 2-3). She reported her last panic attack was one year earlier. *Id*. On mental status examination, Plaintiff was alert, cooperative, and pleasant. *Id*. She was oriented x3, and had a depressed with a restricted affect. *Id*. She denied any hallucinations or suicidal/homicidal ideation. *Id*. Her memory was "ok" and her concentration was adequate. *Id*. Dr. Gao explained that treatment options included lithium, other mood stabilizers, other antipsychotics, or combinations of these drugs. (Tr. 662). He also explained the "[p]ros and cons" related to electroconvulsive (ECT) therapy, including potential death and permanent memory loss. *Id*. Plaintiff understood, and wanted to try ECT "as early as possible." *Id*. Plaintiff began ECT beginning on October 24, 2014, and continued to receive ECT throughout November of 2014.[3] (Tr. 662-665).

**2. Medical Opinions Concerning Plaintiff's Functional Limitations**

On March 25, 2014, State Agency psychologist Karen Steiger, Ph.D., completed a mental RFC assessment. (Tr. 94-96, Exh. 5A at pp. 9-11). She opined that Plaintiff had no significant limitations in her ability to remember, understand, and carry out very short and simple instructions. (Tr. 94). She had moderate limitations in her ability to understand, remember, and carry out detailed instructions. *Id*. Dr. Steiger found Plaintiff was capable of understanding simple 2-3 step

---

3 At the hearing, Plaintiff indicated that she thought the ECT would eventually help, but indicated it had been wreaking havoc with her memory. (Tr. 42-43).

6

work tasks without strict production quotas or demands on time. *Id*. Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. *Id*. She was also moderately limited in her ability to work in coordination with or in proximity to others without being distracted and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 95). She was assessed as having moderate limitations in most areas of social interaction. *Id*.

On May 5, 2014, Dr. Bonder completed a check-box medical source statement concerning Plaintiff's ability to perform mental work-related activities. (Tr. 631-633). She opined that Plaintiff had *extreme* limitations in her abilities to perform the following activities: understanding and remembering complex instructions; carrying out complex instructions; and, making judgments on complex work-related decisions. (Tr. 631). She also found *marked* limitations in the following areas: understanding and remembering simple instructions; carrying out simple instructions; and, making judgments on simple work-related decisions. (Tr. 673). Dr. Bonder indicated that her opinion was supported by Plaintiff's poor concentration and difficulty making decisions. *Id*. In the category of interacting with others, Dr. Bonder opined that Plaintiff would have moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers, but marked limitations in her ability to respond appropriately to usual work situations and to routine changes in the work setting. (Tr. 632). The form states that "[t]he limitations above are assumed to be your opinion regarding current limitations only," unless the medical source could form a reasonable opinion as to the claimant's past limitations. (Tr. 632). Dr. Bonder marked "N/A." *Id*. She further indicated that alcohol or substance abuse did not contribute to the assessed limitations. *Id*.

After the hearing, on December 9, 2014, psychiatrist Jacob McBride, D.O., completed a

7

check-box medical source statement concerning Plaintiff's ability to perform mental work-related activities. (Tr. 673-675). He opined that Plaintiff had *marked* limitations in her abilities to perform the following activities: understanding and remembering simple instructions; carrying out simple instructions; making judgments on complex work-related decisions. (Tr. 673). Meanwhile, he found only *moderate* limitations in her ability to carrying out complex instructions and only *mild* limitations in her ability to understand and remember complex instructions. *Id*. Dr. McBride indicated that his opinion was supported by marked psychomotor retardation, dysphoric mood, and constricted effect, which made Plaintiff's ability to attend to activities of daily living a challenge. *Id*. In the category of interacting with others, Dr. McBride opined that Plaintiff would have moderate limitations in her ability to interact appropriately with supervisors and to respond appropriately to usual work situations and to routine changes in the work setting. (Tr. 674). In addition, he assessed mild limitations in interacting appropriately with the public and with co-workers. *Id*. The form states that "[t]he limitations above are assumed to be your opinion regarding current limitations only," and Dr. McBride did not complete portions of the form inquiring as to the onset of the above limitations or whether alcohol or substance abuse contribute to the assessed limitations. (Tr. 674).

## C. Relevant Hearing Testimony[4]

The ALJ posed the following hypothetical question to the VE:

> I'd like you to assume a hypothetical individual with those past jobs that you described. I'd like you to further assume the individual can work at all exertional levels and can perform simple tasks in a setting with no more than occasional changes; can perform goal oriented work, but cannot perform at a production rate pace; and can infrequently interact with others if that interaction is limited to speaking and signaling. Can this person perform any of the past work that you described?

---
[4] Because the credibility of the Plaintiff is not at issue, her testimony is not summarized herein.

8

The VE testified that such an individual could not perform any of Plaintiff's past relevant work. (Tr. 51). However, the VE testified that there were a number of jobs that such an individual could perform and identified the following jobs as examples: kitchen helper, Dictionary of Occupational Titles ("DICOT") 318.687-010, medium, unskilled, simple, SVP 2 (200,000 jobs nationally, 10,000 in Ohio; merchandise marker, DICOT 209.587-034, light, unskilled, SVP 2 (250,000 jobs nationally, 9,000 in Ohio); and, document preparer, DICOT 249.587-018, sedentary, unskilled, SVP 2 (70,000 jobs nationally, 1,800 in Ohio). (Tr. 52). The VE stated that her testimony was consistent with the DICOT. *Id.* Based on additional hypotheticals posed by the ALJ, the VE testified that being off task twenty percent of the day or two absences each month would be work preclusive. (Tr. 52-53).

In response to questions posed by Plaintiff's counsel, the VE testified that an individual who could not perform complex jobs or even simple jobs would be unemployable, as "[t]here are no other jobs." (Tr. 54-55).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d

9

918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant, Catherine L. Anderson, was insured for a period of disability and disability insurance benefits on the August 5, 2013 alleged onset date, and she remains insured for these benefits through at least September 30, 2018.

2. The claimant has not engaged in substantial gainful activity at any time since the August 5, 2013 alleged onset date (20 CFR 404.1571 et seq., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: an affective disorder and an anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. Since the August 5, 2013 alleged onset date, the claimant has not had an

        impairment, or a combination of impairments, that has met or medically equaled the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Since the August 5, 2013 alleged onset date, and with the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521, 404.1545, 416.921 and 416.945 subject to the following limitations/restrictions: she can perform simple tasks in a setting with no more than occasional changes; and she can perform goal-oriented work but cannot perform at a production rate pace; and she can infrequently interact with others if that interaction is limited to speaking and signaling.

6. The claimant has not been able to perform any of her past relevant work since the August 5, 2013 alleged [onset date] (20 CFR 404.1565 and 416.965).

7. The claimant has been considered to be a person closely approaching advanced age ever since the August 5, 2013 alleged onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education, and she is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's residual functional capacity limits her to a range of unskilled work (20 CFR 404.1568 and 416.968).

10. Having considered the claimant's age, education, work experience, and residual functional capacity, the undersigned concludes that there are a significant number of the jobs in the economy that the claimant has been able to perform since the August 5, 2013 alleged onset date (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant, Catherine L. Anderson, has not been under a disability, as defined in the Social Security Act, at any time between the August 5, 2013 alleged onset date and the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-23).

**V. Law and Analysis**

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

In the first assignment of error, Plaintiff argues the ALJ erred by failing to give good reasons for rejecting the opinions of two treating psychiatrists—Dr. Bonder and Dr. McBride. (R. 11, PageID# 733-734). In the second assignment of error, Plaintiff asserts that the ALJ's finding at Step Five is not supported by substantial evidence, primarily because it discounts the opinions of Drs. Bonder and McBride. (R. 11, PageID# 737-738). These assignments will be addressed

12

together.[5] The Commissioner does not challenge Plaintiff's assertion that Dr. Bonder and Dr. McBride are treating psychiatrists (R. 13, PageID# 748), and the ALJ's decision expressly refers to them as treating psychiatrists. (Tr. 20).

"Provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002) (quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In other words, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)). If an ALJ does not give a treating source's opinion controlling weight, then the ALJ must give "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *See Wilson*, 378 F.3d at 544 (*quoting* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5). The "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is "in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is

---

[5] In the decision, the ALJ conceded that the opinions of Drs. Bonder and McBride found in Exhibits 10F and 14F, "if full[y] credited, would lead to the conclusion that the claimant has had disabling mental impairments." (Tr. 17). Consequently, there is no question that the ALJ's decision to not fully credit those opinions cannot be construed as harmless if the ALJ's analysis was insufficient.

supplied." *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

It is well-established that administrative law judges may not make medical judgments. *See Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (*quoting Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)). Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). "An example of a good reason is that the treating physician's opinion is 'unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.'" *Conner v. Comm'r of Soc. Sec.*, 658 Fed. App'x 248, 253-254 (6th Cir. 2016) (*citing Morr v. Comm'r of Soc. Sec.*, 616 Fed. App'x 210, 211 (6th Cir. 2015)); *see also Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013) (holding that an ALJ properly discounted the subjective evidence contained in a treating physician's opinion because it too heavily relied on the patient's complaints).

Because it has not been disputed that Drs. Bonder and McBride treated Plaintiff, the ALJ was required to provide good reasons for rejecting the limitations assessed by them. The decision addressed the opinions of Drs. Bonder and McBride as follows:

> As noted above in the Finding 3 discussion, and for the same reasons given in the Finding 3 discussion, lesser weight is given to the most restrictive opinions offered by the above-mentioned treating psychiatrists (see Exs. 10F and 14F) as the undersigned finds that these opinions are not supported by the longitudinal record including the evidence referenced in this decision which includes these sources own records. In addition, the undersigned gives lesser weight to the opinions found in exhibit 14F because of an internal inconsistency. That is the psychiatrist who completed the report marked as exhibit 14F that the claimant was only moderately impaired in terms of her ability to carry out complex instructions but

      markedly impaired in terms of her ability to carry out simple instructions.

(Tr. 20).

> In giving lesser weight to these opinions, the undersigned finds that their most restrictive opinions are not supported by the evidence described above which includes these sources own treatment notes. Consequently, in offering the opinions that are found in exhibits 10F and 14F, the undersigned finds that these sources gave undue weight to the claimant's subjective reporting of her symptoms, reports that the undersigned does not find fully credible in light of the longitudinal record relating to the claimant's mental functioning including the evidence referenced above. The undersigned also notes that, unlike the State agency psychologists who reviewed this record, there is no evidence that the aforementioned treating sources are experts in Social Security disability programs.

(Tr. 17).

      The ALJ's statement that the treating psychiatrists' opinions were "not supported by the longitudinal record" or by the psychiatrists' own records are conclusions rather than explanations and, without more, do not constitute good reasons for rejecting a treating source's opinion.[6] However, the ALJ referenced earlier portions of the decision. Essentially, the ALJ offered six reasons for effectively rejecting these opinions: (1) Plaintiff had been able to live alone and care for as many as six or seven pets; (2) Plaintiff's daily activities included shopping, taking walks outdoors, managing her money, and socializing with others; (3) Plaintiff interacted with others on numerous occasions since the alleged onset date; (4) Plaintiff was described on numerous occasions as being alert and/or properly oriented and/or having good concentration; (5) Plaintiff

---

[6] With respect to Dr. McBride, the ALJ also noted that his opinion, contained in exhibit 14F, was internally "inconsistent," "because "the claimant was only *moderately* impaired in terms of her ability to carry out *complex* instructions but *markedly* impaired in terms of her ability to carry out *simple* instructions." (Tr. 20) (emphasis added). The Court disagrees with Plaintiff's contention that such a glaring and irreconcilable inconsistency is "irrelevant." (R. 11, PageID# 734). Indeed, the two determinations are so inconsistent that it is highly suggestive of an error by the treating source in completing the form. Attempting to guess what the treating source actually intended would be inappropriate. In addition, Plaintiff has not argued that the ALJ should have contacted Dr. McBride for clarification. Nevertheless, the noted inconsistency in Dr. McBride's opinion, although significant, is inapplicable to the issue of whether the ALJ gave good reasons for rejecting the opinions of the other treating psychiatrist, Dr. Bonder.

was able to concentrate sufficiently to read books; and (6) the treating psychiatrists, unlike State Agency doctors, are not experts in the field of Social Security disability programs. (Tr. 17). Each of these statements is followed by a string citation to the record. *Id.*

Assuming for the sake of argument that the statements made by the ALJ are supported by the citations, the decision does not actually explain how these observations undermine the reliability of the treating psychiatrists' opinions. Implicit in the ALJ's reasoning is the unsubstantiated assumption that someone as mentally limited as described by the treating psychiatrists would be: (1) incapable of engaging in the aforementioned activities; and (2) would not be alert, oriented or be able to concentrate. An ALJ, however, is not a medical expert and cannot formulate medical opinions. While the ALJ ascribed great weight to the State Agency psychologists (Tr. 17), those opinions do not contain any explanation tending to support the underlying assumptions. In the court's view, the ALJ's determination that Plaintiff's activities and/or mental status examination findings are inherently incompatible with the limitations assessed by the treating psychiatrists is tantamount to a medical judgment. In other words, the ALJ provided no foundation for concluding that an individual capable of performing the above activities could not also have the extreme or marked limitations in carrying out complex or simple instructions. The case law is well-established that an ALJ may not substitute his or her personal interpretation of the evidence for those of trained medical professionals. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2d Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)

16

("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp.2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'") (O'Malley, J.); *Stallworth v. Astrue*, 2009 WL 335317 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).

The decision also does not explain how Plaintiff's aforementioned activities, performed for a limited amount of time each day were inherently inconsistent with the mental limitations found by Plaintiff's psychiatrists. *See, e.g., Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that [a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing and floor sweeping, does not necessarily indicate that this [claimant] possesses an ability to engage in substantial gainful activity. Such activity is intermittent and not continuous, and is done in spite of the pain suffered by [claimant]."); *accord Wheeler v. Colvin*, No. 1:15-CV-01540, 2016 WL 1599961 at *10 (N.D. Ohio Apr. 21, 2016) ("unclear how Plaintiff's attendance at church … or her tempestuous relationship with her pastor undermines [a treating psychiatrist's] opinion concerning Plaintiff's abilities to interact with co-workers, supervisors, or the general public") (Vecchiarelli, M.J.); *Pirrone v. Comm'r of Soc. Sec.*, 2013 WL 821472 (N.D. Ohio Mar. 4, 2013) ("Plaintiff's claim for disability is largely based on her inability to maintain concentration, persistence and pace, as well as problems with stress and fatigue.... the mere fact that she can complete routine tasks does not speak to how long it takes her to complete them.") (McHargh, M.J.).

It also bears noting that some of the characterizations of the record are questionable. The

decision states that Plaintiff was described on numerous occasions as alert, properly oriented, and/or having "good concentration." (Tr. 17). A review of the decision's citations to the record does not reveal any treatment note stating that Plaintiff had "good" concentration. Several of the cited portions of the record state that Plaintiff had "fair concentration," (Tr. 570, 578, 586, 591, 600, 619, 661), while numerous other cited portions of the record indicated that Plaintiff had "poor" concentration. (Tr. 607, 639, 643, 646, 649). Although the decision correctly notes that Plaintiff was alert and oriented, the decision provides no basis for finding that an individual with the assessed limitations could not be alert or oriented. The ALJ also references a May 5, 2014 progress note indicating that Plaintiff "was able to concentrate when she reads books," but did not address subsequent progress notes in June 2014 that stated the opposite.[7] (Tr. 638, 642, 648). In addition, Plaintiff did state that she had been reading a book about depression (Tr. 597), had read some AA related recovery materials (Tr. 642), and that she continued to read books but had "trouble concentrating on them." (Tr. 645, 648).

Furthermore, the underlying decision relies on the statement that Plaintiff "interacted adequately with others on numerous occasions," but the cited portions of the record do not actually support this statement unless the ALJ is simply referring to Plaintiff's interactions with medical personnel. (Tr. 17). The ALJ did not explain how such brief and limited interactions with medical personnel would have bearing on Plaintiff's ability to interact with others, who are not trained mental health professionals, for an eight-hour workday.

Finally, the ALJ noted that the treating psychiatrists, unlike the State Agency psychologists, are not experts in Social Security disability programs. (Tr. 17). To the extent this statement

---

[7] The decision cited to page 637 of the Transcript, but the undersigned presumes the citation was intended to be to page 683.

suggests that the ALJ accorded deferential weight to non-treating State Agency sources over the opinions of treating sources, such an action is impermissible. The Sixth Circuit has explained that:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013); *see also Brewer v. Astrue*, No. 1:10-CV-01224, 2011 WL 2461341, at *7 (N.D. Ohio June 17, 2011) (White, M.J.) (finding that an ALJ may not base the rejection of a treating source's opinion upon its inconsistency with the opinions of non-examining State Agency consultants, as "[t]o do so would turn the treating physician rule on its head.")

The court recommends finding that the ALJ erred by failing to give good reasons for rejecting the limitations assessed by Plaintiff's treating psychiatrist, Dr. Bonder. On remand, the ALJ should issue a new decision that fully explains the weight given to the treating sources.[8] Plaintiff's remaining argument challenging the weight ascribed to her GAF scores and how those impacted her RFC at Step Five is rendered moot and will not be addressed in the interests of judicial economy.

---

8 Plaintiff's brief on the merits did not fully develop an argument related to the ALJ's failure to discuss ECT. New arguments may not be raised in a reply brief. (R. 11, PageID# 734, 737; R. 14, PageID# 758-760). *See, e.g., Cook v. Comm'r of Soc. Sec.*, No. 3:13 CV 1114, 2015 WL 1400647 at *13 (N.D. Ohio Mar. 26, 2015) (Vecchiarelli, M.J.) ("it is well established that a party should not raise new arguments in a reply brief") (*citing Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir.2008)); *Albrecht v. Comm'r of Soc. Sec.*, No. 1:14 CV 2116, 2015 WL 4985475, at *6 (N.D. Ohio Aug. 18, 2015) (White, M.J.) (finding it would be appropriate to deem an argument waived that is raised for the first time in a reply). Nevertheless, the ALJ should also consider this evidence in a new decision.

## IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: March 8, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**